## Case No. 3,105.

### CONN et al. v. PENN.

[4 Wash. C. C. 430.][1]

Circuit Court, E. D. Pennsylvania. April Term, 1824.

APPROPRIATION BY PROPRIETORS OF PENNSYLVANIA—NOTICE—RE-SURVEY—RIGHTS OF PURCHASERS AND SETTLERS.

1. What does not constitute constructive notice of the appropriation of the manor of Springetsburg under the warrant of 1722.

2. The appropriation of Springetsburg manor was not sufficiently notorious, prior to the warrant of re-survey in 1762, to affect with constructive notice subsequent purchasers and settlers.

3. The warrant of re-survey of this manor of 1762, affected all persons with notice of the existence of the manor.

4. A survey of land under a special descriptive warrant, was no more necessary to constitute a proprietary manor under the divesting law, than in the case of a private individual. If the survey was made and returned prior to the 4th of July 1776, it was sufficient.

[1] [Originally reprinted from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States. under the supervision of Richard Peters, Jr., Esq.]

5. Those who acquired titles within the manor of Springetsburg, after the warrant of re-survey, are to be considered as purchasers with notice, and not entitled to conveyances, except on the terms offered by the proprietaries.

6. Those who acquired titles within the manor, prior to 1762, without notice of the re-survey of the manor, on common warrants, applications, and settlements; are entitled to the surplus, as well as to the quantity stated in their warrants, on paying for them on the common terms.

[In equity. Bill by Daniel Conn, Francis Grove, Isaac Grove, and others against William Penn and John Penn, for conveyances of the legal title to lands claimed by complainants under equitable titles.
[There was an interlocutory decree directing certain proofs and appearances before commissioners, and, certain of the complainants refusing to comply with the requirements of the decree, the bill was dismissed as to them. They thereupon appealed to the supreme court, which reversed the decree of dismissal on the ground of its irregularity. See Case No. 3,104, next preceding, and note at the end thereof.]

Mr. Chauncey, Mr. Peters, and J. R. Ingersoll, for plaintiffs.
Mr. Rawle, Mr. Binney, and John Sergeant, for defendants.

WASHINGTON, Circuit Justice, now delivered the opinion of the court. When this cause was heard at the April term 1818 (see Pet. C. C. 496 [Case No. 3,104]), the nature of the proprietary title to the soil of Pennsylvania generally, and to the asserted manor of Springetsburg in particular, was fully examined in discussed by the court; and to the opinion delivered in that case, in relation to those parts of it, we now refer for the purpose of avoiding the unnecessary repetition of the same matter. It was then stated that, by force of certain concessions, or agreements made, and rules and practices of the land office adopted by the original proprietary, all persons complying with the prescribed terms on which the territorial lands of the province were offered for individual appropriation, acquired a title to the portion of land so appropriated by them; not only against other private individuals who might thereafter attempt to appropriate the same lands, but even against the proprietary himself, unless he had previously and by some act of notoriety, evinced his intention to withdraw such land from the general mass, and to appropriate it to his own use, in satisfaction of what was denominated his tenths, and that such intention was made known by a warrant or order to survey such reserves, and surveys thereof were accordingly made for his use. But that after such notorious appropriation of any particular portion of the land for the use of the proprietary, no individual could acquire a title to any portion of the tract so reserved without a special agreement with the proprietary, which

might, or might not be in the common terms, as he might please.

In the examination of the various claims of the plaintiffs, the court will arrange them under the two following heads: 1. Those who acquired titles upon the common terms applicable to the territorial lands, and yet located themselves within the boundaries of the manor, as ascertained by the warrant of survey of 1722, under the authority of Governor Keith, or of the warrant of 1762, issued by Governor Hamilton, and the re-survey made in pursuance thereof, in 1768. 2. Those who acquired titles within the boundaries of the manor, as designated by the survey of 1722, or the warrant of 1762, and the survey made under it, with notice of its existence, either actual or constructive. Under these general heads the present inquiry will be pursued.

1. In the former opinion, it was stated, that the equity upon which the claimants, coming under the first head, could rest their pretensions, was, that they acquired their titles without notice of the legal title of the proprietary to this asserted manor. The correctness of this position we believe to be unquestionable. But since there may be a material difference between the cases of those persons, who acquired titles to lands within this manor before, and those who acquired them after the date of the warrant of re-survey; the inquiry under this head will be confined, in the first place, to those who claim under titles which commenced prior to the 21st of May, 1762; and secondly, to those whose titles originated after that period.

As to the first. That the plaintiffs are equally affected by constructive, as by actual notice of the title of the proprietary to this manor, is a point very properly conceded by the plaintiffs' counsel; but then it is insisted by them, that the warrant and survey of 1722 ought not, under the circumstances which attended those acts, and the evidence appearing in the cause, to be considered as amounting to constructive notice to any of the plaintiffs, whose claims originated by common warrants, applications, or settlements. The difficulty in which this part of the case is involved, was felt by the court at the former hearing of the cause, and we are by no means prepared to say that it is altogether removed by the ingenious and able arguments which have been urged on the present occasion. Nothing can be more improbable, as it would seem, than that the re-survey in 1768 should represent the survey made under Keith's warrant in 1722. The latter warrant is special, and describes, with such apparent precision, the place at which the survey was to begin, that it would seem to us impossible that it could have been mistaken; it is, upon the S. W. bank of Susquehanna, over against Connestogo creek. The courses and distances are plainly marked out: W. S. W. ten miles; thence N. W. by N.

twelve miles; thence E. N. E. to the uppermost corner of the Newbury tract; thence S. E. by E. along the head line of Newbury to the southern corner tree of that tract; and thence down the side line thereof to the river. In this description of the tract to be surveyed, there are no calls for natural or artificial corners which could reasonably have warranted a departure from the prescribed courses and distances, and thereby to countenance the supposition that they were departed from for the purpose of accommodating the survey to other, and more important calls. In addition to all this, the return of survey professes generally to have been executed in conformity to the warrant, and the courses and distances stated in the return are precisely the same as those mentioned in the warrant. The only difference between the authority given, and its execution, is, that the former makes the beginning to be over against Connestogo, and the latter commences at a run called Penn's run, and takes no notice of Connestogo. Whether this be any thing more than a mere verbal difference, does not, and probably cannot, appear at this remote period. It is in proof, that this is a run over against Connestogo; but whether it was ever called Penn's run, or whether there be a run on that side of the river which ever was designated by that name, does not appear, even by traditionary evidence. The boundaries of this tract of land, as asserted in the warrant of re-survey, and the survey made under it, are irreconcilably variant from those stated in the warrant of 1722. The former disregards Connestogo creek as entirely as if no such creek had ever existed, being at a point so high up the river as to leave that creek entirely out of sight. The line to the westward, instead of ten miles, turns out to be seventeen; and the north line, instead of being twelve miles in length, is but the half of that distance. There is another difference which is remarkably striking; provided, the mine tract, surveyed by order of the board of property, was the same which had been previously surveyed for Governor Keith, under the name of Newbury; of which we have very little doubt. It is, that the north line of the survey, under Hamilton's warrant, is considerably to the north of the most northerly line of the above mentioned tract; whereas the warrant of 1722, called expressly for that tract, and was, in some of its lines, to be bounded by it. Were there no other evidence in the cause in relation to this mysterious portion of it, there could scarcely exist a doubt in any mind that the boundaries of Keith's survey, as laid down on the map exhibited at the trial, and contended for by the plaintiff's counsel, are correctly delineated. But the following facts, which are in proof, afford such a mass of positive and circumstantial evidence of the identity of the two surveys, as asserted by the defendant's counsel, as strongly to incline the judgment to embrace this latter

position. The facts alluded to are the following: 1. The recitals contained in the warrant of re-survey in 1762, a period of only forty years subsequent to the original survey, when it is at least probable that Governor Hamilton, and the officers of government and of the land office, had the advantage, not only of the testimony of living witnesses as to the actual lines of the survey, but of their own recollection of the plat which had been made and returned. although it was then lost or mislaid. 2. The agreement of Thomas Penn in 1736, with the fifty-six persons who had previously settled on this manor, with the consent of the proprietaries; and who were so located on, or near to its western, northern, and southern lines, as designated by the warrant of re-survey, and in other parts of the area included within those lines, as strongly to countenance the assertions in that warrant. 3. The warrant of 1741, for laying off the town of York within the manor of Springetsburg. 4. The letter of Mr. Secretary Peters to Mr. Penn, in the year 1743, in which he speaks of York as lying nearly mid way of the manor. 5. A considerable number of surveys made under Thomas Penn's grants, or under warrants to agree, prior to the date of the warrant of re-survey, in all, or most of which, the land is expressly stated to be within this manor. 6. The fact, indisputably established by the evidence in the cause, that there is not a single survey which notices the manor that was located to the south of the south line of Hamilton's survey. 7. The letter of Stevenson, a deputy surveyor, to Mr. Peters, dated in 1759, stating that it was time to sell the lands about York, and the reasons assigned by him why the step should be adopted. His letter to Scull in 1761, in which he complains of certain unauthorised surveys within the survey of 1722, of the manor of Springetsburg, and his account in April 1762 against the proprietaries, for his care of Springetsburg manor from the year 1750. These facts are very inconsiderably weakened by evidence of a negative character given on the part of the plaintiffs, and they were relied upon by the defendant's counsel to prove, not only the truth of the recitals in the warrant of re-survey, but also the notoriety of the existence of the manor as therein asserted, so as to affect with notice all persons who acquired titles within this manor prior to the warrant of re-survey. The weight of this evidence in maintaining the first of these positions, was felt and admitted by this court on the former hearing, and we are compelled to acknowledge that our minds still incline, though with much less confidence than formerly, to the same conclusion.

The second position which these facts are supposed to maintain. remains now to be considered. Admit that the real boundaries of this manor did in fact correspond with the boundaries of the re-survey made in 1768,

does it follow that those who acquired titles to the land within them, prior to May 1762, under common warrants. applications, or settlements, are in equity to be affected with constructive notice of the existence of the manor? This is the great, the perplexing question in the cause. Its solution must rest mainly upon the establishment of the fact, that the asserted manor was withdrawn from general appropriation. by some act of sufficient notoriety to guard those who might desire to acquire lands in that part of the province, against invading this proprietary reservation, and of which they might, and therefore ought to have taken notice. What were the acts which constituted the tract of country, included within the asserted boundaries of Keith's survey, a manor, or proprietary reservation? They were the warrant. the survey, and the return. Were any of these of a nature to afford constructive evidence of their existence to the persons here described? 1. The warrant—that was, contrary to the practice of the proprietaries in appropriating their tenths, issued by the governor, and directed, not to the surveyor-general, to whom all persons looked as the executive officer in land appropriations. but to three private gentlemen, who, though of highly distinguished standing in society, were not the official characters to whom the executions of warrants to survey lands, either for the proprietries or for individuals. had ever before been directed. The warrant was not of record in the land office. 2. The survey—this was not, and could not have been made on the ground, in the usual way, so as to give notice of its execution even to the vicinage, since it was performed in two days, which the evidence of an experienced surveyor, who many years after attempted to retrace its lines, has shown to be impossible. The surveyor may have advanced by the direction of the compass to certain corners, and marked them; but it is nearly impossible that he could have stretched the chain or marked the lines; and in confirmation of this hypothesis. it is proved, that not a marked tree of that survey was found. when Mr. Spangler, at a late period, attempted to retrace the lines of that survey.[2] 3. the return of this survey—this was made, not to the land office, but to the secretary of state's office, where its acceptance was refused. It was. however. together with the warrant and the decision of the counsel, placed upon the proceedings of that body, but was never returned into the land office. It is the opinion of the court that such a warrant, so created, directed, executed. returned, and recorded, cannot reasonably be considered

[2] It is not intended to here intimate an opinion that the proprietors were bound to conform to the ordinary rules of the land office. applicable to private individuals in appropriating their tenths, provided the acts by which their reservations were made. were of a nature to give reasonable constructive notice of their existence to subsequent purchasers and settlers.

as constructive notice to any person of this proprietary reservation.

But there is a much stronger point of view in which this part of the case is to be considered,—namely, the reputation of the manor, independent of those acts which had created it, which the defendant's counsel insist was sufficient to excite inquiry as to the existence and limits of the manor, and to affect, with the consequences of constructive notice, all those who might attempt to appropriate land within those boundaries. That such a reputation prevailed to a certain extent, cannot be questioned; it is abundantly proved by the facts before enumerated as to the asserted existence of this manor. But although these facts may prove that this tract of country was laid off for a manor in 1722, and was so reputed; were they of such a character as to visit with the consequences of constructive notice those who might afterwards wish to acquire lands within that section of country? The strongest evidence in relation to this question, is the acknowledgment of the fifty-six grantees under Thomas Penn, that they were located within the manor of 'Springetsburg; and yet, the weight of this evidence is greatly diminished by the circumstance that, as they were to pay for their lands on the common terms, it was of little consequence to them, as to the quantity to which they were entitled, whether they were within or without a manor. Besides which, that instrument ascertained no boundaries of the manor. The assertions of the warrant of resurvey as to the boundaries of this manor, being long subsequent to the settlements and appropriations which form the subject of out present inquiry, are of course inapplicable. The letter of Mr. Secretary Peters to Mr. Penn, and those of Stevenson, the deputy surveyor, and his account against the proprietaries, were merely private communications; and the surveys of lands within the manor under warrants which recognized the manor, might be totally unknown to others who located themselves under common warrants, or to settlers in general.

The opinion of this court at the former hearing, proceeded mainly upon the ground that the reputation of the existence of this manor, according to its asserted boundaries in the warrant of re-survey, was so general and well established, as to amount to notice to all those who settled, or obtained common warrants prior to 1762; and this opinion was in no small degree influenced by the supposition, that the settlements and improvements made by the licensed settlers within the manor, and the surveys made around and adjoining the different lines of the manor, so conformed to those lines as designated by the warrant of re-survey, as to afford strong evidence of their being the real lines. But it now appears, by the evidence of the surveyor who ran and plotted the lines of the manor, according to the calls of Keith's warrant, that there is not a single warrant, survey or settlement, within or without the manor, which respected, in the slightest degree those lines, by calling for or conforming to them as a boundary. The idea of a general reputation, sufficiently strong to affect subsequent purchasers, is greatly repelled by other evidence, now before the court, which was not exhibited at the former hearing. Many ancient persons, born and brought up within the manor, have been examined, who depose that they never heard of this manor until after the year 1762 or 1768; and there is not a single witness who deposes in favour of the asserted reputation of the manor previous to those years.

After the most anxious examination of the evidence upon this intricate question, we have come to this conclusion: that, although the settlers, under the special license of Thomas Penn, and many others, acknowledged themselves to be located within the manor of Springetsburg, still, the reputation of the existence of the manor was not so generally diffused as to warrant the court in affecting with notice of that fact, persons who acquired titles within the manor, prior to the warrant of re-survey. But suppose the reputation of this manor was so general as to have imposed upon such subsequent purchasers and settlers, the necessity of making such inquiries as might enable them safely to avoid locating themselves within the manor; where were they to obtain the desired information? If they applied to the land office, the only legitimate or known source of information in relation to land titles, they would have found there no evidence of the existence of this manor. Admit, which is going to the verge of the strictest doctrine of constructive notice, and of presumptive evidence, that they should, at that office, have been referred to the secretary of state's office, what information would the warrant and return of survey of 1722 have afforded them? They would have found that the southern line of the manor commenced over against, or opposite to Connestogo creek, and ran westwardly but ten miles, and that the northern line was bounded by a certain point of the Newbury tract, which had not long before been surveyed. But those lines were so entirely at variance with the reputed lines of the manor, that they might naturally distrust the latter, and confide in the former, as indicating the real boundaries of the manor. But in this conflict between the written evidence of the boundaries, and the reputed boundaries, can it be fairly affirmed, that this manor was appropriated by such an act of notoriety as ought to affect subsequent purchasers? We think not. And even in arriving at this extreme point of the case, we have made suppositions which the doctrine of notice to subsequent purchasers does not warrant. The agreement of Thomas Penn in 1736,

with the licensed settlers, being of record in the land office, was, we admit. notice of the existence of this manor. But at what time was this agreement deposited in the land office? Of this there is no evidence. And even if it were proved to have found its way into that office before the year 1762. it would, nevertheless, be a harsh doctrine in a court of equity, to affect subsequent purchasers with constructive notice of the contents of a paper, not otherwise on file, than as being copied into Blunston's license book, with which it formed no necessary. or natural connection. After the most deliberate examination of this intricate question, we have come to the conclusion: that the appropriation of this district of country as a manor, was not sufficiently notorious to affect with constructive notice, subsequent purchasers and settlers. Our opinion upon this point was different at the former hearing of the cause. But as it is not less our wish, than our duty, to decide correctly according to the best of our judgment, we can never feel mortified in correcting a former opinion which we believe to be erroneous. The evidence upon the present hearing. of which we had not the benefit when the former decree was pronounced, has tended, in no inconsiderable degree, to change our opinion upon this point. The second inquiry, under the first head, embraces all those who acquired titles to land within the boundaries of the manor, as designated by the re-survey in 1768, subsequent to the date of the warrant of re-survey in 1762. As to those claimants the court cannot entertain the slightest doubt. This warrant was special, and so certain in all its calls, from the beginning to its close. that the survey could not render it more so. It was impossible that every individual who was desirous to appropriate land on the west side of the river, and who used ordinary caution, could innocently locate himself within the boundaries designated in this warrant. It issued from the land office; was directed to the surveyor general, and was of record on the warrant book of that office. It was, consequently, legal notice to all the world. If facts, occurring in pais, tending to prove that the existence of this manor was notorious in that part of the province, were at all necessary in support of this position, the evidence in the cause furnishes them abundantly. Twenty-eight surveys were made in the manor under Thomas Penn's grants, between the dates of the warrant of re-survey, and the return of the survey under it. Forty-two warrants to agree, for land within the manor, were purchased within the same periods. Three warrants of acceptance, referring to the manor, issued in 1763, 1766, and 1767. Twenty-three surveys under warrants to agree, were made subsequent to May 1762. Twenty-six warrants, excluding this manor by name, were issued

within the same period. The plaintiffs' counsel indeed, could not, consistently with the candour which belongs to their characters, controvert the notoriety which this manor acquired subsequent to the date of the warrant of re-survey; but admitted that from that period, the evidence to establish the existence of the manor, thickened from year to year..

The argument relied upon by the counsel on this side of the cause was, that, to the perfection of a proprietary manor, a survey duly made and returned into the land office, was indispensable; and that, until these acts were performed, there was no appropriation of the tract of land designated by the warrant to the use of the proprietaries, which barred the rights of individuals to locate lands within the boundaries specified in the warrant. The warrant, or order to survey a designated tract of country as a manor, was treated by the counsel as amounting to nothing more than the declaration of an intention to constitute the same a manor, which intention might be afterwards abandoned; and consequently, that the mere indication of such an intention, so uncertain as to its completion, did not create such an appropriation as to interfere with the condition expressed in all warrants, viz. "that the lands to be located should be waste and unappropriated." This. we believe, is a correct statement of the principles contended for by the plaintiffs' counsel, in aid of which, many ingenious arguments were urged. We think that, upon general principles, this argument cannot. for a moment, be sustained. It places the lords of the soil of Pennsylvania upon a ground so unequal with, and inferior to the condition of private individuals, whose rights to portions of that soil grew out of proprietary concessions, as to require, for its support. a practice sufficiently uniform and established to constitute a local law applicable to the subject. But the practice was of a different character. Without encumbering this opinion by an examination of all the evidence upon that point, it may be sufficient to notice that which is directly applicable to the manor of Springetsburg. The numerous warrants to agree, not only for the quantity of land which the warrantees were authorized to appropriate, but for surplus land, upon titles acquired after the year 1762, afford abundant proof that the appropriation of the manor was considered, both by the proprietaries and the claimants, as having been consummated by the warrant of re-survey. There is no opposing evidence to weaken these stubborn and conclusive facts. If a private person obtained a special warrant for land, it was sacred, not only as against other individuals, but as against the proprietaries. They might abandon their rights, or might be guilty of such laches in consummating their titles as to subject their equitable titles to

be postponed in favour of subsequent purchasers without notice. But, except in these instances, the warrant, if special, vested a title which was transmissible by conveyance, devise, or descent; and we need go no farther than the case now under consideration to prove that a survey was not considered essential to the consummation of the title obtained by warrant or settlement, since the majority of the plaintiffs claim under warrants more than half a century old, which either never have been surveyed, or the surveys have not been returned.

Where is the principle of general law which gives validity to those titles against the proprietaries, and yet denies to them similar rights? We know of none, unless it is maintained by the following argument, which has been strongly pressed upon the court: that the divesting law of 1779 has defined a manorial title to be, "a survey of the tract so appropriated, duly made, and returned into the land office." The conclusion drawn from this legislative declaration is, that the territorial lands were not withdrawn from general appropriation before they were surveyed and returned into the land office, and consequently that, until the title of the proprietaries was consummated by this last act, private individuals had a right to treat the tract of country designated by the warrant for a manor as common land. This interpretation of the statute, which has been given to it for the first time on the present hearing, is not, in the opinion of the court, warranted either by the letter or intention of the act. It contains no expressions which look to the definition of a manor, or proprietary reservation. It leaves, and professes to leave, untouched by the general divestiture of proprietary interest in the soil of Pennsylvania, their private lands, whereof they were possessed or entitled to in 1779, and such as were known by the name of their tenths or manors, which had been surveyed and returned into the land office before the 4th of July 1776. These expressions are purely descriptive, not of tenths or manors generally, but of such of them as had been surveyed and returned before a specified day. So far from bearing the construction which is contended for, they plainly admit the existence of manors which had not been surveyed and returned, because it saves those only which were distinguished by those acts. If this law was intended to give a legislative definition of a manor or proprietary reservation, would it not be absurd to make the character of the thing described to depend, not upon those acts which consummated all titles, but upon the time when they were performed? If the return of survey was that act, why was it not a perfect one, if it was made on the 5th as well as on the 4th of July 1776? As a matter of definition merely, time was quite unimportant; as it described the particular property which was intended to be excepted from the general scope of the act.

it was indispensable, or at least was deemed so by the legislature. It was well known to the legislature that the title of the proprietaries to their reservations had therefore no more depended upon surveys and returns than the rights of private individuals to their lands. If a new principle of law was intended to be introduced and applied to the former, is it conceivable that general expressions would have been employed, which could only, by a forced construction, give effect to the intention?

But it is said that in the former opinion delivered in this cause, this court considered the survey and return as essential to the constitution of a manor. We think that no such view was expressed in that opinion, and we are quite confident that it was not entertained by the court, or intended to be expressed. It was stated, and we believe truly, that, by the practice of the officers of the land office, when a portion of land was intended to be withdrawn from the general mass for the use of the proprietaries, it was made known by a warrant of appropriation, and a survey to mark out and locate the ground thus withdrawn. This was merely the statement of an historical fact. But we did not say, much less did we mean to say, that a special warrant did not constitute an appropriation for the proprietaries, which it did in respect to private persons, until it was surveyed and returned into the land office. If the warrant to lay off a manor had been general, a survey was indispensable to the title, as well in the one case as in the other. But it was not so in either, where the warrant was so special as to point out its location. Upon this point then we are of opinion, that all such of the plaintiffs as claim under titles, of whatever kind, which originated subsequent to the date of the warrant of re-survey, are to be considered as affected with notice, and that they have no equity beyond that which is offered to them by the defendants, and upon the terms which accompany that offer.

2. Nothing remains to be said under this head, as it is settled by the previous part of this opinion, in relation to those who acquired titles to land within the manor after the date of the warrant of re-survey. Being purchasers with notice of the manor, they have no equity other than what is offered to them. The laches of most of the plaintiffs in perfecting their titles has been strongly urged against them by the defendant's counsel, not as the court understood, for the purpose of controverting altogether their right to the equitable interposition of the court in their favour, but of diminishing their claim to come in upon other terms than such as the court might think equitable, without regard to the common terms. The court cannot but admit that the neglect alleged by the counsel against the plaintiffs, or many of them, is fully proved, and would be inexcusable in the view of any person who

does' not feel, as the benevolent proprietaries of the province seem always to have felt towards those who settled and improved the soil, and who is not disposed to act in the benign spirit by which they were influenced. But we think that the tribunals of justice acting on this subject, and exercising, not a capricious judgment, but that which legal duty imposes, are bound to regard the uniform conduct of the proprietaries as furnishing a rule of decision founded in the practice and common law (so to speak) of the province. To attempt, at this time, to set up more rigid rules against the purchasers and settlers of that remote period, than the proprietaries practically imposed, would be to take them by surprise, and to affect their rights by something very much resembling the justly reprobated principle which pervades all retrospective laws. Our opinion upon this part of the case may be charged with being over indulgent to the plaintiffs who stand in the predicament described; but we could not reconcile it to our sense of justice, to be more strict.

The remaining subjects of inquiry are, first, the overplus lands; and second, the claim of an abatement of interest upon the purchase money to be paid by such of the plaintiffs as seek conveyances of legal titles.

1. As to overplus lands. The same arrangement of the plaintiffs in relation to this subject seems to be proper, as has already been made of them in respect to their titles to the quantity of lands expressed in their warrants and applications; namely, those who acquired titles upon the common terms, and yet located themselves within the manor, without notice of its existence; and those who acquired titles with notice of the manor, either actual or constructive. As to the former, we entirely agree with the plaintiffs' counsel, that their right to the overplus land is an incident to that which they have to the quantity specified in their warrants, or were entitled to by the practice of the land office, in relation to settlements and improvement rights; and that the two stand precisely upon the same ground in point of law. Why are they not entitled to the overplus on the same terms? The answer given, is, because their warrants expressly stipulated that they were to be located upon vacant and unappropriated land, and the overplus here was not vacant, but had been appropriated by the proprietaries. But it may be replied, that the reason is no more applicable to the overplus land, than it is to the quantity stated in the warrant; and that, if it be a sound one as to the latter, it is equally so as to the former. Why are the plaintiffs, who claim under common warrants, applications, and settlements, prior to the date of the warrant of re-survey, entitled to conveyances upon paying for them upon common terms? It is, and can

be upon no other ground than this, that as to them there was no manor; and they intruded, not into appropriated land, because the appropriation had not been made by such an act of notoriety as could affect their titles. Does not the same reason apply, with precisely the same force, to their overplus land? Considering the manor, as to them, common territorial land, they were justified in treating it as such; and to avail themselves of the benefit of a universal practice which prevailed throughout the whole of the province, except in those districts which were appropriated to the proprietaries, of paying for overplus land upon the common terms applicable to the quantity specified in their warrants. As to the latter description of persons, those who acquired titles, or who located themselves within the manor, with notice of its existence; nothing can be more obvious than that they have no equitable titles to their overplus, and that they must agree with the defendants respecting it, as they would have been obliged to do with the proprietaries antecedent to the passage of the divesting law, as is abundantly proved by the numerous warrants to agree for surplus and other lands, which were given in evidence in the cause. We will not repeat what was said by the court upon the former hearing of this cause, but will merely refer to that opinion, which, in this respect, has not been changed.

2. As to abatement of interest on account of the inroads of the borderers claiming under Maryland, and the revolutionary and late war with Great Britain, the court has nothing to add to the opinion formerly given on this point. In the former decree, the court referred it to the master to report, whether the defendants had, or had not a known agent in this country, authorised to receive the moneys due to them by the plaintiffs, or those under whom they claim, either for the whole, or any part of the period of the revolutionary, or late war with Great Britain. The report made under this order is, that, during the whole period of five wars, the defendants had a known agent in the state of Pennsylvania, authorized to receive all moneys due to them by the complainants, and those under whom they claim, as well as by all other persons. In consequence of this report, the plaintiffs' counsel have declined arguing this point, and submitted it to the court. We are clearly of opinion that no abatement of interest ought to be allowed.

---

CONNECTICUT, The. See Cases Nos. 6,-391–6,393.

CONNECTICUT GEN. LIFE INS. CO. (McMURDY v.). See Case No. 8,903.

CONNECTICUT LIFE INS. CO. (BIDWELL v.). See Case No. 1,393.